UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
Civil Action No.:1: 21-cv-08082

Hao Zhe Wang *pro se*              )
                                   )
                                   )
*vs.*                              )
                                   )
Skype Communications S.a.r.l.., et al.)
                                   )
                                   )
                                   )


### Motion to Vacate Arbitral Award


Plaintiff respectfully petitions the Court to vacate the award of the American Arbitration

Association ("AAA") dated July 13, 2021 that touched upon Plaintiff's claims against the

defendants related to his Skype account. (Ex. 49)

The award was issued in knowing and manifest disregard of law and is fatally flawed in

its reasoning and in its finding of facts that frequently and abundantly self-contradict and are

contradicted by records of the arbitration. The award followed an arbitral process that often and

materially deviated from the applicable rules and was fundamentally unfair and followed a

hearing during which the arbitrator barred evidence pertinent and material to the controversy. In

habitually and willfully violating the applicable rules, the arbitrator exceeded her authority.

Moreover, the arbitrator demonstrated evident partiality and later engaged in corruption. The

award should be vacated.


**Statement of Facts**

In preparing his legal actions against the defendants, Plaintiff received instructions on Defendant Microsoft's website that under Microsoft Service Agreement (Ex. 14) he was bound to initiate legal actions only through American Arbitration Association ("AAA") or through small claims courts. Because his claims contained federal RICO claims for which state courts may lack jurisdiction, Plaintiff submitted his claims to AAA in December 2020 and served notice to the defendants. (Plaintiff Declaration In Support of Motion to Vacate, ¶1) AAA notified the parties in January 2021 that the arbitration had started and listed the applicable AAA rules. (Declaration, ¶3; Ex.2-5). In February and June, Plaintiff twice amended his claims – the second time pursuant to the arbitrator's first scheduling order – and each time the defendants responded by reasserting their defenses. (Declaration, ¶¶5-8; Exhibit 11).

On March 3, the case manager announced the appointment of Myrna A. Barakat as the arbitrator (Declaration, ¶9; Ex. 8). Plaintiff filed his first objection to the arbitrator on the ground that Barakat wholly lacked experience and knowledge in consumer litigation – or any litigation matter – and began a mid-pandemic career change to the arbitration business and started her training and new employment only in recent months and that her *lack* of knowledge and awareness in consumer protection law and civil procedure imposes a heavy burden on Plainiff "to prove both such deviation and the arbitrator's knowledge and awareness of such deviation" to appeal to a federal court to vacate her award. (Declaration, ¶¶5-8; Ex. 9) AAA reaffirmed Barakat on March 5 but did not provide an explanation.

Barakat held a preliminary hearing with the parties on March 31, and issued a scheduling order on April 1. (Ex. 11) Barakat ruled that "Respondent shall provide documents responsive to Claimant's document request (see Claimant 12/31/2020 Demand), not to include any

employment-related data or other personnel information" and ruled that "Consumer Rule R-22" that sets a deadline for identifying witnesses would not be applicable.

At a May 25 meet-and-confer, the defendants' counsel a few technical details of the Skype account access issues underlying the arbitration case that they claimed gave rise to the defenses that they listed in the defendants' Answer to Demand (Ex. 20). The counsel said that Plaintiff was denied service because the defendants logged his Internet Protocol ("IP") addresses and found them to be a public or shared IP and deemed it at the time to be a violation of the Microsoft Service Agreement. In light of these revelations, Plaintiff suspected that the defendants denied him the use of Skype's service in January 2019 because he was connecting to the service at a hotel or through a virtual private network ("VPN") and requested more records (Declaration, ¶¶6, 18; Ex. 21, 22).

Further, Plaintiff identified a few apparent deficiencies in the defendants' June 4 production. In particular, the defendants failed to turn over his "correspondence with 'Case Manager Re-Escalations' since April 2019" and his "correspondence with a Customer Relationship Manager named 'Rion S.'"; "failed to identify 'Rion S.' or his employer"; and "failed to turn over any records describing the systems [defendants] installed to block account accesses that Rion S. alluded to in his communications" with Plaintiff. (Declaration, ¶19; Ex. 28).

At a June 15 status conference, the defendants' counsel alleged that Plaintiff was not using VPN at the time of the incident. Plaintiff had no advance notice that the defendants were going to allege that he was not using VPN at the time of the incident, and Plaintiff responded with his own allegation that at the time he in fact was using VPN and further pointed out that as a factual allegation the counsel's statement was both premature - especially since the counsel was not a fact witness - and inappropriate at a discovery dispute conference. Barakat ruled that the

defendants' studies and policies regarding VPN and public IP were not relevant documents. (Declaration, ¶¶36-38).

On June 9, Barakat noted that Plaintiff "ha[s] included documents in both French and Chinese" and that "[s]hould [he] feel that the exhibits provided in both French and Chinese aid [his] case," he must "resubmit these documents in English." (Declaration, ¶¶20-22; Ex. 24) At the June 15 status conference call, Barakat repeated her instructions that Plaintiff must translate all foreign language texts into English, hundreds of pages in total, within a day; else, she would exclude the texts. When Plaintiff protested again that he should not alone be burdened with translating foreign language texts in the *joint* exhibits, Barakat responded that the texts helped Plaintiff's case, not the defendants', and would not be considered joint exhibits and would not be the defendants' responsibility to translate. Barakat stated at the end of the conference that if she did not have the translation ready in a day, she was going to exclude the evidence *for irrelevance.* (Declaration, ¶¶25, 26) Barakat set her oral warning into words the following day in Scheduling Order 2 and made a new rule that all evidence must be submitted in English only. (Ex. 30) Because neither AAA rules or her April 1 scheduling order have stipulations about this linguistic requirement, Plaintiff was not afforded adequate notice of this new rule that related to his ability to present evidence until it was too late. (Declaration, ¶27)

On June 9, Plaintiff wrote to the opposing counsel and the case manager to introduce "a fact witness...who doesn't speak English and requires a Mandarin interpreter at the hearing." (Ex. 25) At the June 15 conference, Barakat asked Plaintiff about the witness: "what is he?", "who is he?" "a relative?" "family member?" "siblings or parents?" "father or mother?" "Is he a business partner?" "Does his name appear on the documents?" Importantly, Plaintiff's answers to the last two questions were "yes", for the witness's name appeared on numerous records in the joint

exhibits. After the opposing counsel objected that the witness needed interpretation, Barakat proposed that Plaintiff should help the witness prepare a witness statement in English to be submitted in two days and ruled that the witness would not be allowed to appear. (Declaration, ¶¶29-31)

Further, after Barakat learned during the conference that Plaintiff would name more witnesses whereas the defendants would not, she reversed her position in the first scheduling order, which had set no deadlines for identifying witnesses, and abruptly ordered that all witnesses be identified five – changed to three when Plaintiff protested during the call - business days ahead of the June 22 hearing. Then, the next day, before I was able to confirm the availability of other associates for the hearing, including business agents and associates with knowledge of my business activities, Barakat shifted yet again and wrote in Scheduling Order 2 that no other witnesses may be introduced. As a result, Plaintiff did not receive adequate notice of the crucial hearing-related deadlines until it was too late. (Declaration, ¶¶31-33)

After listening to some of Barakat's truly bizarre statements and astounding linguistic contortions that "N/A doesn't mean 'not applicable'. It means 'not specified', and when it is not specified, then it means the Rule-22 applied." and that she "did not understand procedure and protocols to mean general policies", Plaintiff saw the urgent need to be able to preserve records of the June 22 hearing for a court's review and notified the case manager on June 17 that he planned to hire a court reporter. He further notified the case manager that I planned to hire a Mandarin/English interpreter for the hearing. (Declaration, ¶¶32, 46; Ex. 35)

Although the AAA Consumer Rule does not permit the arbitrator any discretion on a party's notice to bring stenographers and interpreters and does not even call for notice to the arbitrator or opposing party of one party's plan to use interpretation, Barakat wrote on June 21

that Plaintiff's request to have a stenographer present must be subject to the defendants' approval that day and further that his request to have an interpreter present was conditional on a preview from him for which portion of the proceeding the interpreter may appear. Barakat never gave her approval before the hearing even after Plaintiff immediately replied with the names and the availability of the interpreter and stenographer. (Declaration, ¶¶47-49; Ex. 35, 36)

On June 16, Plaintiff filed with AAA case manager a second objection to Barakat's qualification (Ex. 31), including bias and ignorance or violation of Consumer Arbitration Rules and Due Process Protocol. Under AAA's Review Standards as well as Consumer Arbitration Rules R-19, objections to the arbitrator are reviewed by AAA administrators and not by the arbitrator herself. The case manager informed parties, however, that the objection to Barakat's qualification had been sent to Barakat herself for review, to Plaintiff's extreme shock and alarm, and that, furthermore, Barakat wanted the opposing counsel to come to her defense and rebut Plaintiff's objection to her qualification, which the opposing counsel did. Parties never received a decision or "reaffirmation" of the arbitrator from AAA – or from Barakat – regarding Plaintiff's second objection before the hearing. (Declaration, ¶¶40-42)

In light of Barakat's intercepting and hijacking her employer's administrative review of a party's objection to her service and the utter corruptness of an arbitrator enlisting the other party's counsel to justify her behavior, Plaintiff filed a third objection (Ex. 33) on June 18, which again reached not AAA but Barakat herself, who neither ruled on it nor reaffirmed her own appointment before the hearing. (Declaration, ¶¶43-45)

At the June 22 hearing, the defendants identified and produced as witness only one employee (out of three) who had interacted with Plaintiff in 2019 and 2020. Plaintiff was able to unmask the identity of a second, and the defendant's sole witness unwittingly revealed the

identity of a third, a colleague he personally knew and worked with. Barakat denied Plaintiff's request to have the defendants produce the two witnesses they failed to identify and produce in clear bad faith as required by Barakat's own scheduling order. (Declaration, ¶51)

The arbitrator disallowed most of Plaintiff's questions to the fact witness as to why Plaintiff's account was blocked when he was trying to use his paid service in January 2019 but not on December 11 when the defendants first flagged his IP address as shared with 259 suspicious accounts and when Plaintiff first made the payment for the Skype service; whether malicious activities indeed took place in Plaintiff's account; why the email verification option, as opposed to the cellphone verification option, was not readily available to users; what a user's possession of a phone number had to do with whether or not she had used the Skype account maliciously; whether in his training and work experience at Microsoft he was ever trained or instructed to use VPN for any reason or any occasion; or any questions related to his interactions with Plaintiff regarding his investigation into a similar incident relating to Plaintiff's Microsoft account (Complaint, ¶¶8-10) referenced in the witness's email to Plaintiff on November 11, 2020. (Declaration, ¶¶51-57; Ex. 50)

Barakat did not ask parties whether they had further proofs to offer or witnesses to be heard, as she was required to do by Consumer Rules R-40. When Plaintiff pointed out that Plaintiff would have more evidence to introduce, including public records that governmental agencies had not been able to provide in time that may establish patterns of unfair business practice, deception, fraud and RICO violations on the part of the defendants, Barakat refused to consider his requests to delay the closing of hearing until he could obtain the relevant evidence. (Declaration, ¶58)

Barakat refused Plaintiff's request to have the same amount of time – or at least more

than just one day - to prepare his post-hearing briefs as the defendants would in preparing theirs

(14 days). Given the one-day deadline, he hastily put together on June 23 a list of case law and

authorities relevant to the claims and procedure of the case, evidence pertaining to Federal Trade

Commission's investigation into businesses that defraud consumers in a manner similar to the

way the defendants block Plaintiff's access to purchased services, and evidence that established

the identity of a fact witness that the defendants refused to identify or produce at the hearing.

(Declaration, ¶¶50, 59-61; Ex. 37, 38, 40, 41, 42)

On June 25, Plaintiff submitted to the case manager a fourth objection to Barakat's

qualification. This time, the case manager confirmed that the objection would now be forwarded

"[t]o the appropriate managerial personnel."  On July 2, the case manager shared with parties a

letter from AAA confirming the start of the administrative review of the June 25 objection.

However, the case manager refused to answer why a similar letter was not issued for Plaintiff's

second and third objections. On July 9, the case manager shared with parties another letter from

AAA (Ex. 48), stating simply that "After careful consideration of your respective contentions,

the American Arbitration Association (AAA) has determined to reaffirm the appointment of

Myrna A. Barakat as arbitrator in the above-referenced matter." (Declaration, ¶¶62-64; Ex. 43-48)

On July 13, Barakat issued a signed award for the proceeding (Ex. 49), which, in three

short pages, contained numerous factual errors contradicted by records. Barakat asserted that "at

the evidentiary hearing on June 22, 2021, HW asserted additional claims of RICO

violations...These claims were not part of any of his prior demands", whereas in fact Plaintiff's

Demand and Amended Demand alleged a joint "enterprise," acts of wire fraud, a pattern and

open-ended "continuity" of these acts and demanded treble damages and his final, June 4 list of

claims specifically demanded "$55,010 in statutory and actual damages pursuant to New York

General Business Law and federal antitrust and racketeering statutes". Barakat asserted that

"HW claims that he was singled out", whereas in fact Plaintiff said no such thing and

consistently alleged in all three demands and at the hearing that the defendants' fraud scheme

ensnared many other customers and requested evidence to be included for the hearing, a request

that Barakat denied at the hearing and ignored in post-hearing briefing. Barakat asserted that the

defendants' actions were "generally accepted business standards", whereas she had in fact barred

discovery of the defendants' general business policies and standards at the June 15 conference

and in her second scheduling order and barred Plaintiff's questions to the defendants' witness

about the latter's handling of similar incidents and customer inquiries. (Declaration, ¶65)

**The Award was Issued in Knowing and Manifest Disregard of Law**

i.     <u>Knowing and Manifest Disregard of Legal Principles Regarding *Pro Se* Papers</u>

Where a plaintiff proceeds *pro se*, the court must construe his complaint liberally and

interpret it to raise the strongest arguments that it suggests. *Sykes v. Bank of Am.*, 723 F.3d (2d

Cir. 2013) That means a court should consider allegations contained in all of the plaintiff's filings

(*Torrico v. International Business Machines Corporation*, 213 F. Supp. 2d). The court in

*Macentee v. Ibm*, 783 F. Supp. 2d noted that courts are to read *pro se* papers liberally and that it

would incorporate facts referenced in the party's submissions but not in the complaint.

Yet, early on at the June 15 conference, when Plaintiff discussed his RICO and New

York consumer protection law claims, Barakat expressed confusion and warned Plaintiff to "cite

the exact statutes" for her to be able to consider them. (Declaration, ¶34) In the end, Barakat's

reasoned award rejected his RICO claims on the ground that Plaintiff did not raise his RICO

claims until the hearing on June 22 whereas in fact Plaintiff's December claims and his amended

February and June claims all alleged a joint "enterprise," acts of wire fraud, a pattern and open-

ended "continuity" of these acts and demanded treble damages and specifically demanded

"$55,010 in statutory and actual damages pursuant to New York General Business Law and

federal antitrust and racketeering statutes." (Ex. 1, 6, 17, 18)

In the two status conferences and in his post-hearing brief, Plaintiff stressed to Barakat

how a court must treat *pro se* parties' filings. Barakat's holding that Plaintiff's repeated

references to federal racketeering statutes in his demands and mentions of them in the status

conferences could not be considered as Plaintiff's raising RICO claims is a knowing and

manifest disregard of the law on how she must read the *pro se* party's demands and claims.


ii.     Knowing and Manifest Disregard of New York Consumer Protection Law

In denying Plaintiff's state consumer protection claim, Barakat was again briefed with

case authorities but wrote her award in willful disregard for the clear language of the law and

abundant precedents. (Ex. 37) The court in *Ackerman v. Coca-Cola Company*, CV-09-0395 (JG)

(RML) (E.D.N.Y. July 21, 2010) noted that in order to show that Plaintiff is entitled to relief for

a violation of New York General Business Law § 349, a plaintiff need to show: (1) that the act,

practice, or advertisement was consumer-oriented; (2) that the act, practice, or advertisement was

misleading in a material respect, and (3) that the plaintiff was thereby injured. See *Stutman v.

Chem. Bank*, 95 N.Y.2d 24, 29 (2000) (§ 349) Moreover, the standard for whether an act or

practice is misleading requires a showing that an ordinary consumer would have been misled by

the defendant's conduct - not the average customer but the vast multitude which the statutes were enacted to safeguard — including the ignorant, the unthinking and the credulous. *Flattau v. John Hancock Mut. Life Ins. Co.*, No. 85 Civ. 5487 (JFK), 1986 WL 14977 (S.D.N.Y. Dec 12, 1986)

During the arbitration, Barakat was presented with a set of facts also nearly identical to those allege in the recent Federal Trade Commission's complaint against MoviePass, Inc., its parent company Helios and Matheson Analytics, Inc. (Helios), and their principals, in which the government alleged that the businesses took steps to block paid users from using the services as advertised, steps that included log-in disruptions, account verifications, confusing and deceptive warning that their accounts had been compromised. (Ex. 38, 40) The FTC complaint and settlement with the offending businesses were both shared with Barakat in Plaintiff's post-hearing briefs. (Declaration, ¶60)

Yet, Barakat wrote in the award that Microsoft and Skype' similar behavior was not misleading or fraudulent business practice but rather "generally accepted business standards", even though Barakat herself had barred discovery of the defendants' general business policies and standards at the June 15 conference and in her second scheduling order and barred Plaintiff's questions to the defendants' witness about the latter's handling of similar incidents and customer inquiries and otherwise had no records reflecting even Microsoft and Skype's own general business policies. (Declaration, ¶¶38, 53, 57, 58, 65)

iii.   Knowing and Manifest Disregard of Legal Principles Regarding Sanctions and
       Remedies for A Party's Refusal to Comply With Record Production Order

Despite the arbitrator's own order for the defendants to produce 1) records, copies and transcripts of the customer service interactions with Plaintiff since January 2019; 2) identities of

employees or agents or affiliates who interacted with Plaintiff; and 3) documents, records, manuals, or other materials that describe the mechanisms, procedures and criteria for suspending and unsuspending a Skype/Microsoft account, the defendants acted in bad faith in refusing to produce complete records in categories 1 and 2 and refused to produce records in category 3. (Declaration, ¶¶17-19, 36-38)

Regarding the last category, the defendants resisted production on the grounds of proprietary information, notwithstanding a protective order that the defendants had actually asked Plaintiff to stipulate to and that was approved by the arbitrator. (Declaration, ¶¶15, 38; Ex.12)

Regarding categories 1 and 2, the defendants repeatedly pled ignorance of the identities of "Leanard Andro F" and "Rion S" who corresponded with Plaintiff regarding his account. In reality, Rion S was personally known by the defendants' witness, Jose Pablo Lippi Ceciliano, who stated under oath that the individual worked in the same department as Lippi. And a quick search for Leanard Andro F in Microsoft's own search engine yielded a top-three result that revealed his full name as Leanard Andro Frondoso. The facts that Rion S was personally known to Lippi, who said to have personally reviewed the entire records on the account, which included Rion S's communications with Plaintiff and that Plaintiff was easily able to identify Leanard Andro Frondoso with a simple search on Microsoft's public search engine spoke to the bad faith of the defendants' failure to identify and produce these witnesses. These two vital witnesses were unmasked during the June 22 hearing, and Plaintiff attached documentary proof of Leanard Andro Frondoso's identity and relationship to Microsoft to his post-hearing briefs filed on June 23. (Declaration, ¶¶17, 19, 51, 61; Ex.15, 28, 41, 42)

Plaintiff further cited abundant case law in his briefs about the common sanctions and remedies imposed by courts when a party obstinately defies a record production order. Failure to produce documents or witnesses is usually considered sufficient prejudice. And courts must impose appropriate sanctions on parties that fail to produce documents, fail to comply with discovery, or fail to disclose witness, both to remedy the prejudice to the other party and to deter bad behavior. (Declaration, ¶59; Ex.37)

Barakat was given ample case authorities but decided not to enforce her own discovery order is not properly enforced. Moreover, at the end of the evidentiary hearing, she completely flipped the script to deny Plaintiff the chance to access the very documents that she long ordered to be produced simply because the award must be typed up within 30 days of the evidentiary hearing. In this she gravely impaired Plaintiff's right to discoverable evidence, to due process, and to a fundamentally fair process but also willfully disregarded unambiguous and long-standing legal doctrines.

iv.  Knowing and Manifest Disregard of Contractual Law

Contractual jurists all agree that definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do. Case law from New York and federal courts are also emphatic that vagueness of material matters in a contract renders it null and unenforceable. The relevant authorities were cited at great lengths to the arbitrator. (Declaration, ¶59; Ex.37)

At the June 22 hearing, and for the very first time, a defendant employee testified that Plaintiff was denied access to his paid account by virtue of section 4.a.ii of the Microsoft Service Agreement. The employee stated that the specific reasons and circumstances for which the

defendants evoke section 4.a.ii to terminate services cannot be publicly discussed because the defendants consider them proprietary information and commercial secrets. The employee testified further that that the defendants updated their understanding of what was suspicious on a monthly or bimonthly basis, but he refused to disclose how the defendants understood or interpreted this contractual clause, again on the ground that it was proprietary information. (Declaration, ¶¶53, 54, 56)

In essence, the defendants admitted that this provision of the contract deliberately was left vague and indefinite; that their own understanding and interpretation of what the contractual provision really meant changed rapidly; and that the meaning of that contractual provision, which permitted the defendants to unilaterally terminate service to their consumers, was a secret that was somehow not subject to judicial review, even with a protective order in place.

Further, the employee testified that at no point during the account creation, in making a payment, or even in a careful reading review of the service agreement, would a consumer be able to learn about the meaning of free (or non-free) accounts that is nevertheless crucial to the limitation of liability clause in Section 13 in the service contract. (Declaration, ¶55)

During the hearing, Plaintiff also described in details the fraud committed through Skype's false promise of providing services in taking his payment for the promised services and in Microsoft and Skype's disruption and denial of his access to the purchased services and in their false warning of compromised accounts. In his post-hearing briefs, Plaintiff further cited ample authorities that New York courts uniformly held that contracts made as a result of fraudulent inducement must be voided and cannot be enforced. To put simply, at common law an unconscionable agreement is one that no promisor (absent delusion) would make on the one hand and no honest and fair promisee would accept on the other. (Declaration, ¶50, 59; Ex.37)

Plaintiff noted in his post-hearing briefs that courts sometimes look to the adequacy of the consideration in order to determine whether the bargain provided for is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms. Plaintiff proffered a detailed account of the two-prong test of unconscionability undertaken by New York courts: a procedural one and a substantive one, the former some showing of an absence of meaningful choice on the part of one of the parties at the time the contract was made, and the latter some indication that the contract terms are unreasonably favorable to the other party. (Ex. 37)

In the instant case, it was difficult to overstate the vast inequality of bargaining power between Plaintiff and the defendants. There was certainly "an imbalance in the understanding and acumen of the parties", as evidenced by the army of lawyers that the defendants hired in drafting and regularly updating the contract and fiercely fighting challenges to it in all forms of legal venues even as they insisted that the terms must change at the defendants' whims and that the true and definite meaning of the terms be shrouded in secrecy and spared from judicial and arbitral scrutiny to protect their commercial advantages.

The procedural unconscionability also flows from the fact that Skype's services came preinstalled on Microsoft's operation system on Plaintiff's computer and the fact that Plaintiff had little choice at the time of shopping in looking for a telecommunications provider when he was traveling internationally.

On the other hand, examples of substantive unconscionability "are virtually limitless but include inflated prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty". *State of New York v Wolowitz*, 96 AD2d; *SIMAR HOLDING CORP. v. GSC*, 87 A.D.3d 688 (2011); *Matter of State of New York v Avco Fin. Serv.,*

50 N.Y.2d 383, 389; *Williams v Walker-Thomas Furniture Co.*, 350 F.2d 445, 449; *Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises*, 58 A.D.2d 482, 489, n 4. Here, the defendant employee testified that at the time of the account creation and Plaintiff's payment for it, the defendants were already aware that Plaintiff was connected from an IP address with low Reputation Score that the defendants' automated systems and artificial intelligence would actually prevent him from using the services that he was paying for. In other words, the defendants knew at the time of contracting that Plaintiff, in sending a payment to Skype, was at the time guaranteed to receive no consideration in return under the defendants' understanding of the contract.

Bakarat said not a word on the issue, and her "reasoned" award did not at all touch upon whether or not the vague contractual provisions should be nullified as Plaintiff demanded in his June 4 demand. Her knowing disregard for the contractual law issue should be grounds for *vacatur*.


v.    Knowing and Manifest Disregard of Federal Arbitration Act

It is likely that an attorney with Barakat's resume knew little about the legal doctrines and federal and state statutes before Plaintiff cited these to her during the status conferences and the hearing and in post-hearing briefs. It was certainly a perverse way for AAA to short-circuit any judicial reviews of AAA's awards - as provided for in Section 10 of the Federal Arbitration Act - by appointing an attorney with no litigation experience and no legal expertise. Her ignorance can be fatal to any litigant's attempt to vacate her awards on the ground of manifest disregard of law.

But appointments of incompetent arbitrators - over a party's early and repeated objections to her qualifications on the ground of her ignorance of law and gross incompetence - would violate AAA's own rules and constitute another reason for *vacatur*. Such appointments are clear subversion of the purpose of FAA and are in themselves sufficient ground for *vacatur*.

Likewise, Barakat's actions in days before the hearing to affirmatively prevent Plaintiff from creating records of the hearing that can be used in judicial review were subversive, and these actions were also knowing and manifest disregard of the law, not to mention AAA's own applicable rules.

**Arbitrator Refused to Hear Evidence Pertinent and Material to the Controversy**

9 U.S.C. § 10(a)(3) permits *vacatur* of an arbitral award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." The Second Circuit in *Tempo Shain Corp. v Bertek, Inc.*, 120 F. 3d 16, 20 (2d Cir. 1997) made it clear that courts are to review *de novo* excluded evidence, such as the excluded testimony of Mr. Otero, to determine whether the majority arbitrators improperly excluded evidence "pertinent and material to the controversy." Section 10(a) (3) of the Federal Arbitration Act, 9 U.S.C. §10(a) (3). In the instant case, the award should be vacated because the arbitrator peremptorily barred records and witnesses that evidence Plaintiff's damages and the defendants' RICO violations and deceptive business practices.

i.      Arbitrator Barred Evidence of Plaintiff's Emotional Damages

While there may be "no need to examine plaintiff's full medical history" to establish his emotional damages. (*Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010), a plaintiff's "bare allegations of mental/emotional distress, mental anguish, stress and inconvenience," unsupported by any evidence, are insufficient to establish the damages." (*Giaccio v. City of New York*, 502 F. Supp. 2d 380, 387 (S.D.N.Y. 2007) Moreover, a plaintiff should demonstrate that a defendant's actions were "specifically" linked to his emotional distress ("the plaintiff alleged actual damages that included 'emotional distress and anguish' but failed to explain how those issues were 'specifically' caused" by the defendant. *Noriega v. U.S. Bank, Nat'l Ass'n*, 16-CV-1058(JS)(ARL), at *22 (E.D.N.Y. July 25, 2017)).

Plaintiff had planned to introduce a family member as a witness of Plaintiff's mental distress after he was deceived by the defendants about the possible hacks of his accounts. (Declaration, ¶¶28-32) He had also shared with the defendants and the arbitrator documents related to his academic research, which also served as "evidence related to Consumer's emotional damages calculations and particular mental vulnerabilities as a victim of fraud and malicious deceit. (Ex. 18, 51) The arbitrator barred the witness and excluded the documents for reasons related to interpretation of the witness and translation of the documents. (Declaration, ¶¶20-27, 30-33)

As Plaintiff's correspondence with the case manager and other records of the arbitration demonstrate, Barakat barred Plaintiff's evidence and witnesses for reasons wholly unrelated to their relevance to his claims but because of her discomfort with foreign language texts and with the prospect of having non-English speakers at the hearing. Barakat's ground for the exclusion of the evidence was unreasonable.

ii.  Arbitrator Barred Evidence of Plaintiff's Loss of Time

Plaintiff suggested that he would also have some of his business associates as witnesses at the hearing to demonstrate the financial losses he suffered in lost time. He suggested - and submitted documents that proved - that his relative would also offer testimony in this regard. (Declaration, ¶¶30-32)

The arbitrator barred the witnesses for reasons related to interpretation of the witness and the timing of the evidentiary hearing. As Plaintiff's correspondence with the case manager and other records of the arbitration demonstrate, Barakat barred Plaintiff's evidence and witnesses for reasons wholly unrelated to their relevance to his claims but due to her discomfort with foreign language texts and with the prospect of delaying the trial and having non-English speakers at the hearing. Barakat's ground for the exclusion of the evidence was unreasonable.

iii.  Arbitrator Barred Evidence of Defendants' Fraud and Deceptive Business Practices

The defendants refused to identify and produce two defendants agents who interacted with Plaintiff in 2019 and fed him misleading information about his Skype account and also refused to reveal records related to their general corporate policies and to the automated systems that blocked Plaintiff's access to his Skype account in January 2019. Barakat refused to enforce her first scheduling order that required the identification of the witnesses and the production of the records.

As Plaintiff's correspondence with the case manager and other records of the arbitration demonstrate, (Declaration, ¶¶38, 46, 53-55) Barakat barred evidence and witnesses about the defendants' general business policies and protocols for reasons wholly unrelated to their relevance to his claims but due to her discomfort with the prospect of delaying the evidentiary

hearing and also the closing of the record. Barakat's ground for the exclusion of the evidence was unreasonable.

iv.    Arbitrator Barred Evidence of Pattern of Defendants' RICO Violations

In discerning a RICO pattern, courts have held that plaintiffs usually have to prove the racket takes years to unfold, involves a variety of criminal acts, and targets more than one victim. (*KAYE v. D'AMATO* No. 09-1091; *GAMBOA v. VELEZ* No. 05-1690; *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d). A scheme that targets only one victim would fail the pattern test. (*W. Assocs. Ltd. P'ship. v. Mkt. Square Assocs.*, 235 F.3d).

None of this means, however, that courts do not permit a single individual to bring civil RICO actions. Courts allow each victim to bring suits as long as she alleges the multitude of victims and can eventually gather evidence to prove it. In other words, each victim can sue the RICO violator, *adducing* evidence of the offense against the other victim to meet the proof requirements of the statute as to a pattern. (*Papagiannis v. Pontikis*, 108 F.R.D. 177, 179 (N.D.Ill.1985))

Plaintiff alleged continuity of the defendants' racketeering activities lasting for years, involving several and a variety of predicate acts, and targeting more than one victim (namely, victims other than he). However, at the initial evidentiary hearing, Plaintiff was frustrated in his attempt to question the defendants' witness regarding other blocked accounts the witness handled due to the opposing counsel's objections that those accounts are not the same as the Skype account in question that the defendant's employee handled in October 2020. The opposing counsel even objected to any discussion of Plaintiff's Microsoft account that the defendant witness also handled in November 2020. (Declaration, ¶57; Ex. 50) In disallowing his questions

to the witness about the possible pattern of the defendants' RICO violations, Barakat took away a crucial pillar from Plaintiff's RICO claims and effectively prejudged his RICO claims.

At the hearing, Plaintiff also described evidence that he expected to produce in proving these allegations, including results of government investigations into similar complaints of consumer fraud against the defendants. The delay of the delivery of these records was beyond Plaintiff's control and would not have prejudiced the defendants, but Barakat ruled that the records must be submitted within a day or be excluded. (Declaration, ¶¶58, 60)

. As records of the arbitration demonstrate, Barakat barred evidence and witnesses about the defendants' general business policies and protocols for reasons wholly unrelated to their relevance to Plaintiff's claims or the other party's defenses but due to her impatience with having to deal with a discovery dispute a week before the evidentiary hearing and with the possibility of not being able to close the record of arbitration within 30 days of the hearing. Barakat's ground for the exclusion of the evidence was unreasonable.

**Arbitrator Exceeded Her Authority and Used Fundamentally Unfair Procedures**

Under 9 U.S.C. § 10(a)(4), a court must vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

The party's agreements that need to be enforced may extend to the very procedures under which their arbitration will be conducted. The courts do not generally oversee the procedures used by arbitrators in conducting arbitrations. *Asturiana De Zinc Marketing Inc.v.LaSalle Rolling*

Mills, 20 F.Supp.2d 670, 672 (SDNY, 1998) They can, however, determine whether the procedures used by arbitrators were fundamentally unfair. *Tempo Shain Corp v, Bertek Inc.* 120 F.3d 16, 20 (2d Cir. 1997)

In the instant case, in agreeing to arbitrate the controversy, the parties had agreed to abide by AAA's rules. Barakat vastly exceeded her authority in serially and blatantly flouting the rules set by her employer. (Declaration, ¶¶2, 3; Ex. 1-5, 14) As a result, Barakat conducted a one-sided proceeding that was fundamentally unfair - and AAA, too, broke its own rules in appointing and reaffirming such an inexperienced and unqualified arbitrator.

Plaintiff suffered enormous prejudice at every turn as a result of the unfair procedures. They prejudiced Plaintiff by preventing him from presenting evidence in support of his case, and they foreclosed development of the evidentiary record required by federal and New York law for resolving the disputes presented. Barakat further denied Plaintiff the opportunity to present any witnesses at the arbitration hearing, but permitted the defendants to present its witness, a legal professional who accessed the customer service records only after the legal action became imminent in October 2020, and barred Plaintiff from compelling the identification and production of two witnesses that provided technical and customer service to Plaintiff in early 2019. The truncated arbitration proceeding precluded evidence pertinent and material to the controversy, denied Plaintiff the opportunity to present his case in a meaningful manner, and denied Plaintiff equal treatment with respect to the presentation of evidence.

Each of these violations is an additional ground requiring the vacating of the award. Barakat's flouting of her employer's rules constituted action exceeding her powers or action that so imperfectly executed her powers that a mutual, final and definite award was not made within the meaning of 9 U.S.C. § 10(a)(4). Accordingly, the court should vacate her award.

i.

AAA's Consumer Rules R-2 (f) clearly purports to apply to both sides equally and specifies that a consumer's demand and the business's answer should have enough degree of details. Throughout the arbitral process, however, Barakat constantly ordered Plaintiff to flesh out his claims, legal theories, and supporting evidence ahead of the hearing while she asked little of the defendants. Her orders were not only burdensome but also inequitable. Barakat in effect ordered Plaintiff as much as possible when the defendants were permitted to give away virtually nothing. Only a week before the end of the discovery was Plaintiff finally able to force some bare-bone information about the nature of the defenses and about the allegations that the defendants were going to make through some private bargaining with the counsel.

The drastically unequal requirement Barakat imposed on the two parties in terms of forcing Plaintiff to give a much more detailed picture of his allegations, his theories of harm, his arguments, and even a complete witness statement from a witness whom Plaintiff had timely identified but Barakat barred from the hearing rendered the arbitral process fundamentally unfair and unequal. (Declaration, ¶¶28-32, 35) As a result, the defendants received vastly superior notice of Plaintiff's claims, allegations, arguments, and witness testimonies compared to the paltry notice Plaintiff received of the defendants' pleadings, allegations, theories, and witness testimonies. All this runs afoul of Principle 1 of the Consumer Due Process Protocol.

ii.

The arbitrator was confused about her jurisdiction. At the June 15 conference, she started

out by suggesting that the arbitration process could be utilized only to settle contractual disputes

or disputes arising from specific provisions in the contract. (Declaration, ¶34) This

characterization of arbitrations is hardly correct. And while R-14 (a) gives arbitrators broad

powers to rule on the arbitrability of any claim, as long as both parties have had the chance to

review all the claims and counterclaims and have consented to have those claims arbitrated, then

the arbitrator has jurisdiction. During the arbitration and before the June 15 conference, Plaintiff

thrice filed his claims, and the defendants thrice filed answers. Barakat could hardly disavow her

jurisdiction over Plaintiff's timely and properly filed claims.


iii.

   Plaintiff alleged that the defendants repeatedly contradicted themselves in handling his

Skype account and that the inconsistencies suggested the defendants must have deviated from

their own corporate policies some of the time. As a result, Plaintiff made, *inter alia*, a state law

claim of deceptive and unfair business practice based on these allegations and requested

information about the defendants' related policies.

   Barakat, however, made clear that she understood AAA Consumer Arbitration Rules to

permit discovery only of documents related to a consumer's account with a business rather than

documents related to the consumer's claims and his case. (Declaration, ¶¶37-38) This

demonstrates poor understanding of R-22 of the Consumer Arbitration Rules about the

fundamentally-fair process and of Principle 13 of the Due Process Protocol, which calls for

arbitrators to ensure that parties "have access to information that is legally obtainable and

relevant to their case". The silly notion that consumers are entitled only to information about

their own accounts virtually ensures that no consumers would ever be given a fair chance to prove their allegations and claims.


iv.

At the June 15 case management conference, which took place five business days before the hearing, Barakat suddenly reversed her position in her previous scheduling order, which had set no deadlines for identifying witnesses, and abruptly ordered that all witnesses be identified three business days ahead of the hearing. A day later, she shifted yet again and ruled that no other witnesses may be introduced. As a result, Plaintiff did not receive adequate notice of a crucial hearing-related deadline until it was too late. (Declaration, ¶¶28-33) This violated Principle 12.1 of the Consumer Due Process Protocol.

Moreover, although neither AAA rules or her previous scheduling order have stipulations about the language in which evidence must be submitted, Barakat fashioned a new rule on June 15 and ordered Plaintiff to translate hundreds of pages of foreign texts into English within a day when she knew that it could take a skilled translator much longer time to complete the task. Plaintiff was not afforded adequate notice of this new rule that related to his ability to present evidence until it was too late. This violated Principle 12.1 of AAA's Consumer Due Process Protocol.


v.

Barakat barred Plaintiff witness's testimony after the opposing counsel objected to the prospect of letting Plaintiff interpret for his witness. And when Plaintiff notified the arbitrator

and the opposing counsel that he would bring a certified interpreter to the hearing, Barakat barred the interpreter from the hearing. (Declaration, ¶¶28, 30, 46-49)

R-28 of the Consumer Arbitration Rules provides for any party to make its own arrangement for interpreters without notice to the opposing party or the arbitrator. R-28 also gives the arbitrator no discretion in approving or disapproving a party's interpreters. Barakat exceeded her authority in barring Plaintiff's interpreter from the hearing.

In a similar abuse of power and discretion, Barakat interfered in Plaintiff's hiring of a stenographer as was his right under R-27. After Plaintiff gave a timely notice of his planned use of the court reporter, Barakat indicated that she must give approval, which she then withheld. (Declaration, ¶¶46-49)

R-27 does not even provide for the opposing party's objection to or an arbitrator's disapproval of stenographer use. Indeed, how could it? Stenographers generate records that any party has the right to request pursuant to R-48. Those records are widely relied on whenever parties seek court review of arbitral awards. If R-27 gave an arbitrator the discretion to reject court reporters, it would at once gut R-48 and give the arbitrator the power to shield all her actions against scrutiny by federal courts. Barakat's interference in Plaintiff's hiring of the court reporter was thus another flagrant example of her abusing her power and exceeding her authority.


vi.

When Plaintiff twice filed objections to Barakat's qualifications on June 16 and 18, the AAA case manager transmitted the two objections to Barakat herself. (Declaration, ¶¶39-45; Ex. 31-34) This was an appalling violation of R-19(b) of the Consumer Arbitration Rules, which mandates that "the AAA will decide if the arbitrator should be disqualified."

vii.

In his opening statement at the June 22 hearing, Plaintiff was giving citations of case law and points of authorities related to his claims. However, Barakat cut him off and told him to save the details for a post-hearing brief that she would allow him to submit after the end of the hearing. At the end of the hearing, however, Barakat ordered that the unrepresented Plaintiff must file a memo about the case law by the end of the next business day. In the same breath, the Arbitrator gave the opposing counsel 14 days to respond with their own memo of law. (Declaration, ¶¶50, 59) This blatantly unfair and biased ruling runs afoul of Principles 1 and 12 of the Consumer Due Process Protocol.

viii.

Barakat did not ask parties whether they might have further proofs to offer or witnesses to be heard, in accordance with R-40. And when Plaintiff specified that he would have more evidence to introduce, including public records that governmental agencies have not been able to provide in time, Barakat refused to consider his requests to delay the closing of hearing until he could obtain the relevant evidence. (Declaration, ¶58)

ix.

Parties agreed – and Barakat pledged – at the first status conference that her award was going to be a reasoned one. (Declaration, ¶13) But the July 13 award is anything but. It is silent on many of Plaintiff's claims, including those on New York General Business Law 349, tort claims of intentional infliction of emotional damage, and unconscionability of the contract.

Rather, what little Barakat said to justify the award showed her inability to reason well. Within the same page, Barakat noted that "HW claims that this incident was not an isolated event but...constituted "a clear pattern of criminal behavior" but promptly contradicted herself by saying that "HW claims that he was singled out", whereas in fact Plaintiff repeatedly pled that the defendants' fraud scheme ensnared many other customers and requested evidence to be included for the arbitration, a request that Barakat herself willfully and repeatedly denied at the hearing and ignored in post-hearing briefing. By glaring omission and by silly self-contradictions, Barakat demonstrated herself unable to reason in writing the award. In failing to provide any meaningful reason behind her signed award, Barakat exceeded her authority that was created by the parties' agreement to arbitration and a reasoned award.

**Arbitrator Demonstrated Evident Partiality and Eventually Engaged in Corruption**

Under 9 U.S.C. § 10(a)(2) of the FAA, a court must vacate an arbitration award "where there was evident partiality or corruption in the arbitrators, or either of them." Barakat repeatedly demonstrated her prejudice against Plaintiff by claiming that his time had no value or that he was not even entitled to a discovery conference, which is required under AAA's rules under the circumstances. Barakat repeatedly demonstrated her bias toward the defendants by sparing them questions about the details and nature of their allegations and legal defenses and about the scope of the testimony that their employee-witness was expected to give and by handing the opposing counsel significantly more time – 14 days to one – than the *pro se* Plaintiff to file post-hearing briefs.

Investigative journalism at leading newspapers has found that arbitrators are often compelled to cultivate close ties with companies to get business, and this often leads to bias towards businesses in consumer arbitrations (for instance, https://www.nytimes.com/2015/11/02/business/dealbook/in-arbitration-a-privatization-of-the-justice-system.html). Dozens of arbitrators admitted in interviews for this New York Times article that "the pressure to rule for the companies that give them business was real", and judges have similarly found that "[t]his is a business and arbitrators have an economic reason to decide in favor of the repeat players." But rarely does an arbitrator tie her own interests and continued employment so brazenly and nakedly to the interests of a party in an active arbitration as Bakarat did, such that her "interest or bias" must be said "to be direct, definite and capable of demonstration rather than remote, uncertain, or speculative." *Sanford Home for Adults v. Local 6, IFHP*, 665 F. Supp. 312, 316, 320 (S.D.N.Y. 1987).

Contrary to R-19(b) of the Consumer Arbitration Rules, which stipulates that "the AAA will decide if the arbitrator should be disqualified", Bakarat intercepted Plaintiff's second and third objections to her qualification and took over the administrative review of her own misconduct. But the most shocking transgression happened when she ordered the opposing counsel to come to her own defense and produce testimonies and legal analyses as to why she ought not to be disqualified. In doing so, Bakarat abused her power and engaged in corruption, and in keenly offering Bakarat just what she asked for, the defendants' counsel also immorally procured Bakarat's inexcusable dependency on the counsel's testimonies and legal advice in her continued employment and aided her corrupt behavior. The award must be vacated on the ground of the arbitrator and the defendants' collusive act of corruption.

Arbitrator demonstrated prejudice against *pro se* litigants and damages measured by loss of time

Even when not ruling on discovery requests before her, Bakarat volunteered many

statements during the June 15 conference that betrayed her bias against Plaintiff's claims and

telegraphed how she intended to rule on them in the award.

For example, Bakarat showed clear prejudice against a large component of Plaintiff's

damages, i.e., his time away from work. In telling Plaintiff to do Chinese-English translation, she

said Plaintiff should do it because "it is, well, no cost to you". (Declaration, ¶25) Clearly, in the

her mind, to have the defendants to do any translation might entail the cost of hiring a translator

and paying a big-law partner and senior associate to proofread the translation, apparently the real

cost in the arbitrator's impression, whereas Plaintiff's time and efforts were worthless. This

preconceived judgment of what the value of Plaintiff's lost time – nil – was profoundly harmful

and prejudicial.

Early on at the June 15 conference, when Plaintiff discussed his RICO and New York

consumer protection law claims, Barakat interrupted him and warned him to "cite the exact

statutes" at the June 22 hearing if he wished her to consider his claims. (Declaration, ¶34) That

she eventually wrote in the award that Plaintiff did not make any RICO claims prior to the June

22 hearing – despite his repeated allusions to the defendants' violation of the anti-racketeering

statutes in all three filed claims – demonstrated not only Barakat's manifest disregard for well-

established legal principle regarding courts' interpretation of *pro se* papers but also Barakat's

prejudice against unrepresented consumer-plaintiffs.

At the end of the June 15 conference, when Plaintiff challenged Barakat to explain why

"mechanisms, procedures and criteria" in her first scheduling order did not mean general

business policies, Barakat grew testy and impatiently pronounced that she already offered the

Plaintiff too much accommodation by agreeing to hold the discovery conference when she could have just told him no. (Declaration, ¶38) Here she appeared wholly ignorant of R-24 of the Consumer Arbitration Rules under which Plaintiff had sought the conference. R-24 mandates "the parties and the arbitrator conduct a conference call to attempt to resolve the issue that gives rise to the proposed motion," and the June 15 conference arose out of Plaintiff's written request to of Bakarat that he be granted leave to file a written motion to compel. R-24 would permit her to consider the question of filing *only after* she conducted the conference.

Needless to say, the arbitrator's statement that she was ready to deny Plaintiff's motion to compel even before calling the conference – not to mention that she was disinclined to even holding the June 15 conference to consider Plaintiff's motion to compel - demonstrated transparent prejudice. Here Bakarat did not even bother to even conceal her prejudice against Plaintiff's attempt to receive evidence relevant to his claims or her contempt for the AAA rules.

Arbitrator demonstrated bias towards the defendants

AAA's Consumer Arbitration Rules R-2 (f) clearly purports to apply to both sides equally and specifies that a consumer's demand and the business's answer should both have enough degree of details. Throughout the arbitral process, however, Barakat constantly asked Plaintiff to flesh out his claims and legal theories while she asked none of this of the defendants. (Declaration, ¶¶34, 35; Ex. 19) These actions were inequitable because Barakat made Plaintiff tip his hands as much as possible. As a result, the defendants received vastly superior notice of Plaintiff's claims, allegations, arguments, and witness testimonies compared to the paltry notice Plaintiff received. This demonstrates Barakat's bias and favoritism towards the defendants.

By the same token, after Plaintiff identified the witness he intended to introduce at the June 15 conference, Barakat asked "what is he?", and the question was soon followed by relentless interrogations: "who is he?" "a relative?" "family member?" "siblings or parents?" "father or mother?" "Is he a business partner?" "Does his name appear on the documents?" When Plaintiff requested that he should likewise be able to learn more about the defendants' witnesses, Barakat said she would turn to questions about the defendants' witnesses - but eventually asked not a word of their witnesses' positions, experience, competencies, or the scope of the anticipated testimonies. In the end, Barakat simply barred Plaintiff's witness and suggested that he should instead submit a witness statement in two days to the defendants. (Declaration, ¶¶29, 30) As a result, the defendants received vastly superior notice of the nature and substance of the witness testimonies that Plaintiff had intended to rely upon than the other way around. This demonstrates Barakat's bias and favoritism towards the defendants.

Early in at the June 15 conference the arbitrator advised Plaintiff to limit the claims he intended to raise at the hearing to contractual breach because she was going to arbitrate only what is in the contract. Her "advice", which came when the defendants made no objection to the arbitrability of Plaintiff's state and federal claims, seemed to set herself up for refusing to enforce her own April 1 record production order later at the conference. (Declaration, ¶¶34, 38) This "advice" clearly demonstrates her prejudice against most of Plaintiff's claims before he gets the chance to make them at the hearing but also her bias and sympathy toward the defendants' reluctance to delay the hearing and undertake further production.

That she wanted Plaintiff alone to shoulder the impossible burden of translating exhibits jointly submitted by parties just because she knew only Plaintiff intended to rely on them also spoke to her bias. (Declaration, ¶¶20-27) Although parties struck an agreement to submit exhibits

jointly, when the arbitrator asked for foreign texts to be translated into English, she demanded that Plaintiff do it and declared as void the parties' private agreement about joint exhibits. In this she again showed her bias and sympathy toward the defendants' reluctance to delay the hearing by spending time on the document translation.

Arbitrator demonstrated bad faith

It is only a matter of time before bias and partiality bend the meaning and integrity of words. And it is only inevitable that bad faith in semantics betrays the speaker's bias and prejudice. Such bad faith - a reckless readiness to bend and distort her own words and a faithless relationship to the conventional meaning of her own lexicon - is the final proof of Barakat's utter disregard for neutrality during the arbitral proceeding. Barakat demonstrated a whimsical understanding of the English lexicon and at the same time fierce determination to make sure that no dictionary stands between her and a preferred and prejudged result.

Just two examples would suffice here. When questioned by Plaintiff at the June 15 conference why her first scheduling order, which said "Witnesses (Consumer Rule R-22): N/A" and which imposed no deadline for identifying witnesses, was suddenly supplanted by a new order to identify all witnesses five days before the hearing *issued five days before the hearing*, Barakat said "N/A doesn't mean 'not applicable'. It means 'not specified', and when it is not specified, then it means the Rule-22 applied." (Declaration, ¶¶13, 32; Ex. 11) Not even the finest sophist from ancient Greece could give a more wondrously specious argument about semantics.

When Plaintiff then brought up the discovery dispute and noted that the defendants defied her scheduling order for them to produce "Documents, records, manuals, or other materials that describe the mechanisms, procedures and criteria for suspending and un-suspending a

Skype/Microsoft account", the arbitrator replied that she "did not understand procedure and protocols to mean general policies" and thought procedure and protocol to mean just Plaintiff's account-specific records (Declaration, ¶38; *Cf*. Merrian Webster's definition of *procedure* - "a traditional or established way of doing things...PROTOCOL" - and *protocol* - "a code prescribing strict adherence to correct etiquette and precedence...a set of conventions...CONVENTIONS")

The infinite elasticity that defines the relationship between this arbitrator and her words - even written words – indicates a poor character and bad faith.

This bad faith easily manifests itself elsewhere. In alternative to discarding evidence in foreign languages that is material to Consumer's claims, Barakat made a ludicrously phony offer to Consumer during the June 15 status conference to keep the evidence included for the hearing: Barakat stipulated that these texts, many hundreds of pages in total, must be translated within a day in order not to be excluded (apparently another way of ensuring that her hearing date goes on unchanged). (Declaration, ¶¶20-23; Ex.23-25) Her "offer" is bad faith also because she telegraphed her intention a week before the status conference that she had intended to exclude all foreign language exhibits.

Barakat's statement near the end of the June 15 conference that she was going to exclude the evidence *for irrelevance* is yet another instance of bad faith, for she already complained that she could not read a word of the Chinese-language exhibit and had no idea what the exhibit was even about and had only the sketchiest and very incomplete understanding of what the French-language exhibit was about. Declaration, ¶¶25-27; Ex. 30) While the arbitrator might have tried to find a pretext in the rule book for barring evidence, her justification in the name of irrelevance was made in sheer bad faith insofar as she already professed not to even understand the texts.

R-19 of the Consumer Arbitration Rules stipulates that an arbitrator must perform her duties in good faith and shall be disqualified for bad faith. Barakat's many acts of bad faith were thus instantly disqualifying and should be additional grounds to vacate the award.

Arbitrator was corrupt and abused her power in enlisting the opposing counsel's legal advice in defending herself in her employer's investigations

After Plaintiff filed his June 16 objection to Barakat's appointment for some of the reasons outlined above, the case manager inexplicable sent the objection directly to *the arbitrator herself*. She then ordered that the opposing counsel respond to the objection, in essence, to come to her defense. And the counsel, including a Harvard Law-educated lawyer and a litigation partner at a big-law firm, spoon-fed this inexperienced arbitrator with a set of "interpretations" that might better reconcile her behavior with ethical and AAA rules and also with a set of "facts" that might contradict Plaintiff's allegations of Barakat's misconduct. (Declaration, ¶¶40, 41; Ex. 32)

This created a truly bizarre spectacle of self-dealing and corruption. And it also started a perilous new phase of the arbitral process, which became one of toxic dependency of the arbitrator on one party's counsel. It is safe to assume that Plaintiff's objections to Barakat's qualification were among the first she received in her new career in arbitration. The help by two experienced commercial and arbitration litigators with decades of experience in framing the legal issues in and drafting plausible defenses for Plaintiff's objections to her misconduct would doubtless be important if she were to be called by her employer to answer questions about her misconduct. Moreover, the role that the opposing counsel appeared ready to play as friendly

witnesses would obviously be much appreciated for any arbitrator fighting allegations of such misconduct.

It was bad enough that Barakat was reviewing of Plaintiff's objection to her own appointment. It was even worse that she directly sought advice from one party's counsel in countering another party's accusations *in a trial of her own misconduct*. Ultimately, it was made worse still when the counsel, participants in the June 15 conference and thus potential fact witnesses, proffered not only advice but a preview of some "facts" that they could present for any eventual AAA administrative review or judicial review of Plaintiff's charges.

Barakat's request that the opposing counsel came to her aid during the review of Plaintiff's objections was a corrupt act that far exceeded her authority. The counsel complied with her order, and Barakat was able to receive bountiful tips from the counsel about how best to square her words and deeds with AAA's rules during any administrative review. The counsel's free legal services were in essence a bribe that was worth $6,250 dollars to Barakat in her reaffirmed appointment in this arbitration case and worth probably hundreds of thousands more to her in making sure that her budding new career in arbitration was not derailed in its first months. From that juncture onwards, Barakat must also have known that she must continue to rely on the counsel's potential testimonies about what she said and did in order to keep her job. This created an intolerable level of dependency and conflict of interest that destroyed any veneer of impartiality. From June 16 on, there could no longer be any reasonable expectation that an arbitrator this corrupt and this reliant on one party for her continued employment could be trusted to be neutral.

Wherefore, Plaintiff respectfully petitions that this Court issue an order to vacate and for such other and further relief as the Court may deem appropriate in the instant matter.

Most respectfully,

## CERTIFICATE OF SERVICE

I, Hao Zhe Wang, hereby certify that on the 11st day of October, 2021, a true copy of the

foregoing Motion to Vacate was served via electronic mail to the defendants and their counsel

via electronic email:


Yana Rosenbloom at yaros@microsoft.com, patgog@microsoft.com

Geoffrey Brounell at geoffreybrounell@dwt.com;

Mohammad Pathan at mohammadpathan@dwt.com.