

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Case Number: 01-20-0019-3949

HaoZhe Wang (Claimant)
-vs-
Skype USA/Microsoft (Respondent)

## AWARD OF ARBITRATOR

I, Myrna A. Barakat, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, HaoZhe Wang, who was self-represented, and Skype USA/Microsoft, represented by Geoffrey Brounell and Mohammad Pathan of Davis Wright Tremaine LLP, at an evidentiary hearing held on June 22, 2021, do hereby, AWARD, as follows:

In this case, Mr. HaoZhe Wang ("HW")'s Skype account was temporarily suspended by Skype USA ("Skype"), a company owned by Microsoft ("MS"), while HW was traveling to China. Although the parties disagree on the date the account in question was opened, they agree on the following:

- On December 11, 2018, HW paid $10 to purchase "Skype Credit," which allowed him to make calls using Skype. No other payments were made to open the Skype account or to subscribe to any additional Skype services.
- On or about January 20, 2019, while at a hotel in China, HW attempted to log on to his Skype account but was unable to. On or about January 23, 2019, in order to restore his account, HW verified his account via SMS; to do so, he had to provide Skype with his cell phone number to receive the SMS required for authentication. Shortly after doing so, HW's Skype account was restored.
- Following this incident, HW sought an explanation from MS as to the reason for the account suspension. He was told that there were concerns regarding "questionable activities" and referred to a link for additional information. HW continued to seek more specific information regarding the circumstances that led to the account suspension. On January 26, he received an email advising him that MS could not disclose specifics regarding the block but listed some reasons that could have led to it. HW continued to inquire for more detail. On October 27, 2020, after escalation regarding the matter, a MS representative, Mr. Jose Pablo Lippi, reiterated to HW that MS reserves the right not to share information regarding the internal business and systems operations. He went on to describe the use of artificial intelligence by MS to, for example, systematically and automatically scan activity to detect and disrupt suspicious activity and notify users of such. Additionally, in that email, Mr. Lippi informed HW that his account was thoroughly reviewed and confirmed to HW that it was not compromised. The parties submitted various email exchanges and transcripts of conversations HW had with Skype representatives covering this matter. Neither party contested the accuracy of those exchanges and transcripts.
- The parties agree that the "Microsoft Services Agreement," effective May 1, 2018 ("MSA"), applies to this case and that it is governed by NY law.

**HW's Claims and Demands**:

On December 18, 2020, HW filed an initial demand with the American Arbitration Association requesting $13,230 in monetary relief and a "[f]ull technical accounting of the possible hacking incident behind the January 2019 incident." In this initial demand, HW alleges that MS not giving him a satisfactory answer to his queries as to why his account was suspended led him to spend numerous anxious hours monitoring his account and online activity and that he was entitled to notification from MS if there were bad actors involved or, at the very least, that MS should bear the cost of his monitoring efforts. He also claims that he was "coerced" into giving his mobile number to authenticate and reinstate his Skype account. Further, he states that MS "luring [him] into an agreement and into paying amounted to acts of wire fraud." Finally, HW claims that this incident was not an isolated event but a "scheme" and constituted "a clear pattern of criminal behavior" and concludes with allegations of wire fraud.

On February 20, 2021, HW amended his initial demand, claiming an additional $10,000 in "emotional damages as well as for the businesses' fraudulent act, deceitful business practice, and intentional infliction of emotional distress." In this amended demand, HW states that Mr. Lippi's confirmation on October 27, 2020 that his account was not compromised "exposed the lies the businesses fed [him] prior to that point and the fraud they committed."

On June 8, 2021, at the request of the Arbitrator to flesh out his initial claims, HW filed an amended demand. In that final demand, HW's claims rose to $75,020 and included a series of additional requests: (i) to enjoin MS from requesting personal information that wasn't provided at the start of the service, to order MS to disclose how HW's personal information was "collected, stored, handled and distributed since January 2019' and to order destruction of such data, (ii) "[t]o enjoin [MS] from denying services on the ground of [HW's] use of public or shared IPs, (iii) [t]o enjoin [MS] from denying services on the ground of using public or shared IPs when [HW] is physically in China, (iv) [t]o declare null and void any contractual clauses that may be construed by [MS] to deny services to [HW] for using public or shared IPs; and (v) to award HW $75,020 in damages: $10 per the contract, $20,000 for intentional infliction of emotional distress and $55,010 in "statutory and actual damages for financial losses."

Finally, at the evidentiary hearing on June 22, 2021, HW asserted additional claims of RICO violations for deceitful business practices, antitrust violations with respect to MS's VPN offering as well as FTC-related unfair businesses practices. These claims were not part of any of his prior demands, but the Arbitrator gave him the opportunity to submit additional documentation in support of these claims following the hearing, which HW did. MS was also given the opportunity to submit additional documentation to respond to those claims and submissions, MS elected not to.

**MS's Response**:

MS refers to the MSA provisions to deny all allegations. More specifically, they point to the following provisions:
- Article 4(a)(ii): "*If we reasonably suspect that your Microsoft account is being used by a third party fraudulently (for example, as a result of an account compromise), Microsoft may suspend your account until you reclaim ownership. Based on the nature of the compromise, we may be required to disable access to some or all of Your Content*." MS contends that this provision "expressly authorized [MS] to take the steps about which [HW] complains."
- Article 13: "*If you have any basis for recovering damages … you agree that your exclusive remedy is to recover, from Microsoft or any affiliates, resellers, … direct damages up to an amount equal to your Services fee for the month during which the loss or breach occurred (or up to $10.00 if Services are free). You can't recover any other damages or losses, including direct, consequential, lost profits, special, indirect, incidental or punitive*." MS contends that, based on the foregoing, should liability be found, the MSA limits MS's liability to $10.

**Analysis and Final Award**:

The circumstances described and agreed as factual by both parties fit squarely within the fact pattern contemplated by Article 4(a)(ii) of the MSA. Although HW claims that he was singled out, nothing in what was submitted by him

provides any evidence of such. Respondent's submissions and witness, Mr. Pablo, credibly described the processes that led to the account suspension, none of which indicate nefarious nor unreasonable behavior, motive or intent vis a vis HW. Similarly, nothing in HW's submissions substantiates his claim of being coerced to give MS his cell number. By his own admission, HW voluntarily shared his cell phone number in an attempt to restore his Skype account while traveling in China. HW had the option to either delay sharing his cell phone number until he was back in the US to the extent he had privacy concerns while he was in China, as he claims, or dig deeper for a different resolution method, which he claims was possible but not readily offered up.

Even if one were to find any fault by MS either in suspending the account or, as HW also claims, in not giving him timely and satisfactory answers to his queries following the incident, Article 13 (which appears in bold in the MSA) is clear on its face and limits liability to $10. On this point, HW's contention that the wording as to what constitutes a free account is unclear is somewhat puzzling. Indeed, HW claims that, because he purchased Skype credit, his account was not a "free" account and thus not subject to the $10 cap on liability (Article 13 of the MSA). If one were to agree with his interpretation then, per Article 13 of the MSA, had fault been found then he wouldn't be entitled to any amount since he didn't pay any service fee for the month during which he alleges there was a loss or breach. In fact, documents submitted by MS reveal that HW did use some of his Skype credit prior to their expiration and HW confirmed that the payment he made was in exchange for credit to make Skype calls and that he made no other payments.

Although one could have some sympathy for HW's dissatisfaction with MS' customer service and his privacy and identity theft concerns, the reality in which we live in requires that we constantly monitor our online activity and, individually and collectively, take all action necessary to secure such. MS acted squarely within the confines of the MSA and what are generally accepted business standards. The MSA provisions govern, are valid and are clear with respect to the lawfulness of MS' conduct.

Based on the foregoing, all of HW's claims are denied.

The administrative fees of the American Arbitration Association (AAA) totaling $3,150.00 shall be borne as incurred, and the compensation of the arbitrator totaling $6,250.00 shall be borne as incurred.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

| 7/13/2021 | /s/ Myrna Barakat |
|---|---|
| Date | Myrna A. Barakat, Arbitrator |