UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

Civil Action No.:1: 21-cv-08082

Hao Zhe Wang *pro se*  )
)
)
*vs*.  )
)
Skype Communications S.a.r.l.., et al.)
)
)
)

**Plaintiff Declaration In Support of Motion To Vacate**

I, Hao Zhe Wang, hereby declare as follows:

1. I am over the age of 18 and am competent to testify to the facts declared below, and could testify truthfully thereto if required. I am the plaintiff in the instant case. In preparing this Declaration, I have relied on my personal knowledge and review of the entire record in the related arbitration.

Start of arbitration, claims, answers, and applicable AAA Rules

2. I filed a demand for arbitration (Ex. 1) against the defendants with American Arbitration Association ("AAA") on or around December 18, 2020 that included a request for in-person hearing and for discovery. The choice of arbitration and the selection of the arbitration administrator were imposed by Microsoft Service Agreement. (Ex. 14)

3. On January 27, 2021, AAA's case manager sent parties a letter (Ex. 2) stating that "The Consumer Arbitration Rules (Ex. 3) have been applied to this matter". An attachment to the letter titled "CONSUMER ARBITRATION REFERENCE SHEET" (Ex. 4) further states that AAA's Consumer Due Process Protocol (Ex. 5) applied.

4. Albeit not referenced in the letter, AAA also publishes Review Standards (Ex. 29) for administrative review of objections to arbitrators' qualification.

5. On February 20, I sent the case manager and the defendants an "Amended Demand and Claims." (Ex. 6) The case manager confirmed its receipt. (Ex. 7)

6. On May 25, in response to my motion for more definite statement, (Ex. 19) the opposing counsel requested a meet-and-confer call, in which the counsel offered a few previously

undisclosed technical details of the Skype account access issues underlying the arbitration case that they claimed gave rise to the defenses that they listed in the defendants' Answer to Demand. (Ex. 20) The counsel said that I was denied service because the defendants logged my Internet Protocol ("IP") addresses and found them to be a public or shared IP and deemed it at the time to be a violation of the Microsoft Service Agreement. In light of these revelations, I suspected that the defendants denied me the use of Skype's service in January 2019 because I was connecting to the service at a hotel or through a virtual private network ("VPN").

7. The arbitrator held a telephonic Preliminary Hearing with the parties on March 31, and issued a Report of Scheduling Order the following day. (Ex. 11) The arbitrator directed me to submit an updated list of claims and demands by June 4.

8. In compliance with the arbitrator's April 1 scheduling order and in light of the factual allegations made by the opposing counsel during a May 25 call, I also transmitted to the case manager and the opposing counsel an updated list of my claims and a list of description of each claim and damages and remedies. (Ex. 16-18) The opposing counsel, in turn, wrote to the case manager that "As a follow-up to Mr. Wang's June 4, 2021 updated list of demands, Respondents will maintain their original Answer and Defenses served on February 10, 2021." (Ex. 27)

First Objection to Barakat's Qualification

9. On March 3, the case manager announced the appointment of Myrna A. Barakat as the arbitrator and sent parties a copy of her resume. (Ex. 8) The resume showed an attorney never before involved in consumer litigation – or any litigation matter – who began a mid-pandemic career change to the arbitration business and started her training and new business only months ago.

10. While the defendants' counsel approved the appointment of Barakat, I promptly objected on the ground that "she may lack the legal expertise to recognize unfairness and steer the process as close as possible to the idea of fairness and justice embedded in, say, FRCP" and that if the arbitrator deviated from rules of procedural fairness, I would face a heavy burden "to prove both such deviation and the arbitrator's knowledge and awareness of such deviation". The proof of the latter would be particularly difficult if Barakat's resume already proved the arbitrator's *lack* of knowledge and awareness of consumer protection laws and other legal principles encountered in civil litigations in general. I expressed fear of the "injustice that the consumer may be precluded from remedies for even the grossest unfairness in a court in New York or Second Circuit." (Ex. 9)

11. My March objection reflected my understanding of the Due Process Protocol that arbitrators should be able to "understand and conform to pertinent ADR rules, procedures and ethical standards" (p.11) and that there must be standards of competence and qualification "for Neutrals within the program which are appropriate to the issues or disputes being addressed." (pp.14-15) The objection reflected my fears that the arbitrator

might understand little of the AAA procedural rules or the substantive legal issues (e.g., New York consumer protection law and federal RICO statutes) but also stemmed from the suggestion in the Due Process Protocol that "Each party should be afforded discretion to reject any candidate with or without cause." (p.14)

12. The case manager confirmed the receipt of my objection on March 4 and indicated that AAA would review the objection. On March 5, the case manager wrote to parties that "the American Arbitration Association (AAA) has determined to reaffirm the appointment of Myrna A. Barakat as arbitrator." (Ex. 10) Notably, the letter said "[t]his decision is made based upon input from the case administrator followed by *final determination by the appropriate management personnel*." (emphasis added).


April 1 Scheduling Order

13. Barakat held a telephonic Preliminary Hearing with the parties on March 31, and issued the Report of Scheduling Order on April 1. (Ex. 11) Barakat ruled on my request for in-person hearing that a video hearing would be conducted; stipulated that a reasoned award would be made in writing; ordered that "Consumer Rule R-22" would not be applicable; and ordered that parties should attempt to agree upon and submit a set of joint exhibits.

14. At the preliminary hearing, the defendants' counsel objected to my December 2020 document requests. Barakat ruled that with the exception of "employment-related data or other personnel information", "Respondent shall provide documents responsive to Claimant's document request (see Claimant 12/31/2020 Demand)" by June 4, which included "Documents, records, manuals, or other materials that describe the mechanisms, procedures and criteria for suspending and unsuspending a Skype/Microsoft account."

15. The defendants' counsel and the arbitrator further insisted to me at the preliminary hearing that the arbitral proceeding was subject to confidentiality and that the defendants may seek the additional warranty of a protective order. The opposing counsel later requested such a protective order, which Barakat granted on May 12. (Ex. 12)


Dispute over Defendants' Record Production

16. During the same conference call, the defendants' counsel and I spoke on the phone and agreed to submit evidence as joint exhibits. On June 4, both parties were unable to use AAA's website for uploading the joint exhibits. The defendants resorted to using dropbox.com to share the files (Ex. 13), while I tried to email the documents as attachments to emails and was successful with documents of smaller sizes and less successful with documents with the largest file size. For the oversized documents, I nevertheless gave a description of the documents (Ex. 16) and was able to upload those to AAA's website afterwards. Later, I also uploaded an annotated table of contents that listed the documents I intended to introduce and the relevance of each to my claims. (Ex. 51)

17. The defendants also transmitted a letter on June 4 (Ex. 15) that purported to list "all Microsoft / Skype employees you communicated with from January 2019 to the present". The list included "Jose Pablo Lippi Ceciliano" and "Leanard Andro F. With respect to Mr. Andro F.," whom the defendants were "unable to identify his full name or which of the Respondents was his employer."

18. Also in light of the factual allegations made by the opposing counsel during the May 25 call as well as reviewing the records produced on June 4, I conferred with the opposing counsel to request further records. And when the counsel refused my requests, I submitted the request to the case manager to be forwarded to the arbitrator  on June 9. (Ex. 21, 22)

19. Further, I identified a few apparent deficiencies in the defendants' June 4 production. In particular, the defendants failed to turn over my "correspondence with 'Case Manager Re-Escalations' since April 2019" and my "correspondence with a Customer Relationship Manager named 'Rion S.'"; "failed to identify 'Rion S.' or his employer"; and "failed to turn over any records describing the systems [defendants] installed to block account accesses that Rion S. alluded to in his communications" with me. (Ex. 28) This discovery dispute, too, was shared with case manager to be forwarded to Barakat, who in response scheduled a status conference for June 15.


Exclusion of foreign language documents

20. On June 9, the case manager also wrote to me in a curt message that "The arbitrator...would like me to inform you that you have included documents in both French and Chinese. Should these documents be necessary the arbitrator asks that you please correct this issue." (Ex. 23)

21. In reply, I asked "what do you mean by 'correct this issue'?" (Ex. 23) The case manager answered that "Should you feel that the exhibits provided in both French and Chinese aid your case, the arbitrator asks that you please resubmit these documents in English for their review." (Ex. 24)

22. Although the case manager did not frame Barakat's "issue" as the nature and relevance of the texts, the documents in question were subjects of my academic research but also related to proof of my emotional damages. As such, I believed the documents would indeed aid my case. Still, I felt unable to translate the documents in their entirety into English in a few days. As such, I responded that "I am prepared and have planned to translate the relevant passages myself at the hearing" and argued that "Seeing that the opposing counsel would introduce witnesses at the hearing to interpret some long strings of indecipherable numbers that comprise a big part of the opposing party's evidence, I figure it is only fair that I, too, get to introduce a witness (namely myself) to interpret my exhibits." (Ex. 24)

23. I further contended that since the foreign language texts in question were joint exhibits, it was unfair that Barakat tasked me with the translation of the texts and "if the Arbitrator would like a certified translation of these J exhibits, the request should not be put to me alone." (Ex. 25)

24. The next day, the case manager wrote to confirm that the upcoming status conference would address the issues of "Relevance of documents submitted to date" and "Witnesses parties expect to call and relevance." (Ex. 26)

25. At the June 15 status conference call, Barakat warned me that I must translate all foreign language texts into English; else, she would exclude the texts. Further, she ruled that I must translate the texts, many hundreds of pages in total, within one day, for her hearing date apparently must be changed. I protested again that I should not alone be burdened with translating foreign language texts in the *joint* exhibits. Barakat ruled that the texts helped *my* case, not the defendants', and would not be considered joint exhibits, and that it was my responsibility to translate them. Moreover, in telling me to do translation, Barakat said I should do it because "it is, well, no cost to you".

26. Near the end of the conference and in summarizing the proceeding, Barakat revisited the topic and told me that if she did not have the translation ready by the impossible deadline she imposed, she was going to exclude the evidence *for irrelevance*.

27. Barakat set her oral warning into words the following day in Scheduling Order 2. (Ex. 30) Although neither AAA rules or her April 1 scheduling order have stipulations about the language in which evidence must be submitted, Barakat fashioned this new rule on June 15. I was not afforded adequate notice of this new rule that related to my ability to present evidence until it was too late. I did not attempt this utterly impossible task.

Exclusion of Plaintiff's witnesses

28. On June 9, I also wrote to the opposing counsel and the case manager that I needed to introduce "a fact witness...who doesn't speak English and requires a Mandarin interpreter at the hearing." In response, the case manager wrote that "Should you feel that an interpreter in *(sic)* necessary, please note that it is it your responsibility to arrange for one to attend." (Ex. 25)

29. At the June 15 conference, when I mentioned the witness I intended to introduce, Barakat asked "what is he?", and the question was soon followed by relentless interrogations: "who is he?" "a relative?" "family member?" "siblings or parents?" "father or mother?" "Is he a business partner?" "Does his name appear on the documents?" Importantly, my answers to the last two questions were "yes", for the witness's name appeared on numerous records in the joint exhibits. When I insisted that I should likewise be able to learn more about the defendants' witnesses, Barakat said she would turn to questions about the defendants' witnesses - but eventually asked not a word of their witnesses' positions, experience, competencies, or the scope of the anticipated testimonies.

30. When I raised the prospect of my interpreting for the identified witness at the hearing, the opposing counsel objected that I should not interpret for my witness. Instead of the obvious solution to having a certified interpreter present, which Barakat refused to approve, Barakat proposed that I should help the witness prepare a witness statement in English to be submitted in two days and that the witness would not be allowed to appear.

31. Also during the July 15 call, and immediately after Barakat learned during the conference that I would name more witnesses whereas the defendants would not, she reversed her position in the first scheduling order, which had set no deadlines for identifying witnesses, and abruptly ordered that all witnesses be identified five – changed to three when I protested during the call - business days ahead of the evidentiary hearing.

32. When I asked why her first scheduling order, which had "Witnesses (Consumer Rule R-22): N/A" in black and white and imposed no deadline for identifying witnesses, was suddenly supplanted by a new order to identify all witnesses five days before the hearing *issued five days before the hearing*, Barakat said "N/A doesn't mean 'not applicable'. It means 'not specified', and when it is not specified, then it means the Rule-22 applied."

33. Then, the next day, before I was able to confirm the availability of other associates for the hearing, including business agents and associates with knowledge of my business activities, Barakat shifted yet again and wrote in Scheduling Order 2 that no other witnesses may be introduced. As a result, I did not receive adequate notice of the crucial hearing-related deadlines until it was too late.

Other statements and rulings by Barakat at June 15 conference and in June 16 Scheduling Order

34. Early on at the June 15 conference, Barakat advised me to limit my claims to contractual breach. When I indicated that my claims included also RICO statutes and New York consumer protection law, she expressed confusion and asked me to cite the exact statutes. It is inconceivable that a judge in New York's small claims court – the requirement of fundamental fairness of which is referenced in the Due Process Protocol and of which, also according to the Protocol, AAA's consumer arbitration process aspires to be the equivalent – would be unaware of New York General Business Law 349 or a judge in a federal court unaware of RICO statutes. Nevertheless, I gave Barakat these statutes as well as case authorities that a *pro se* claimant may not be barred from pressing claims just because he failed to cite the exact statutes in his complaint.

35. Barakat then proceeded to press me to give her a much more detailed picture of my allegations right on the spot during the call, as well as to preview my theories of harm and my legal arguments for her (and the opposing counsel). She asked none of this of the defendants' factual allegations, defenses or legal analysis.

36. In resisting my record requests for their policies on VPN or public/shared IP, the defendants' counsel said "VPN use was not at issue" and made the allegation that I was

not using VPN at the time of the incident. I had no advance notice that the defendants were going to allege that I was not using VPN at the time of the incident, and I alleged that at the time I in fact was using it and further pointed out that as a factual allegation the counsel's statement was both premature - especially since the counsel was not a fact witness - and inappropriate at a discovery dispute conference.

37. Barakat quickly ruled that the defendants' studies and policies regarding public IP or VPN were not relevant documents. She made that ruling despite my allegations that I was banned from Skype services when using VPN and despite uploaded evidence of the VPN service. (Ex.52)

38. When I brought up the discovery dispute and noted that the defendants defied her March 31 order for them to produce "Documents, records, manuals, or other materials that describe the mechanisms, procedures and criteria for suspending and un-suspending a Skype/Microsoft account", the prospect of supplemental production that may delay the hearing clearly irked Barakat, who replied that she "did not understand procedure and protocols to mean general policies" and interpreted procedure and protocol to mean just my Skype account-specific records. The defendants further resisted production on the grounds of proprietary information, notwithstanding a protective order that the defendants had actually asked Plaintiff to stipulate to and that was approved by the arbitrator. In concluding the conference, Barakat impatiently pronounced that she already offered me too much accommodation by agreeing to hold the discovery conference when she could have just told me no.

## Second objection to Barakat's qualification as arbitrator

39. On June 16, I filed with the case manager a second objection to the arbitrator's qualification, (Ex. 31) including bias and ignorance or violation of Consumer Arbitration Rules and Due Process Protocol. Under AAA's Review Standards as well as Consumer Arbitration Rules R-19, objections to the arbitrator are reviewed by AAA administrators and not by the arbitrator herself. AAA should reaffirm/disqualify the arbitrator, which AAA did with my earlier objection in March and later objection in July.

40. The next day, however, the case manager sent parties a mystifying email asking "Can opposing counsel please provide comments in regard to Mr. Wang's objections raised for the Arbitrator's review," (Ex. 32) which indicated that my objection to Barakat's qualification had been sent to the arbitrator herself for review, which greatly alarmed me.

41. The opposing counsel complied with Barakat's request and provided an account of the June 15 conference that was factually untrue, which also sought to rationalize Barakat's statements and paint her behavior in much better light. (Ex. 32) The case manager then confirmed that "The Respondent's email responses to Claimant's June 16, 2021 objections were forwarded to the arbitrator for review." (Ex. 32)

42. Unlike the determination letters on AAA stationary that I received for my first and fourth
objections, I did not receive any decision or "reaffirmation" of the arbitrator from AAA
regarding my second objection before the hearing.

Third objection to Barakat's qualification as arbitrator

43. In light of Barakat's intercepting and hijacking her employer's administrative review of a
party's objection to her service and the utter corruption of an arbitrator reviewing and
ruling on her own disqualification, I filed a third objection (Ex. 33) on June 18. I pointed
out to the case manager that per AAA rules objections are meant to be sent to AAA
management for administrative review, not for Barakat herself to review. (Ex. 34)

44. When the case manager failed to send parties the receipt of the newest objection among
receipts the case manager sent for other correspondence from the parties that day, I
resubmitted the objection and again cautioned the case manager to forward my objection
to the appropriate administrative organ. In response, the case manager sent a one-liner in
the morning of the hearing that "Your emails have been forwarded to the Arbitrator
accordingly." (Ex. 34)

45. Unlike the determination letters on AAA stationary that I received for my first and fourth
objections, I did not receive any decision or "reaffirmation" of the arbitrator from AAA
regarding my third objection before the hearing.

Barakat barred court reporter and certified interpreter from the hearing

46. After joining the arbitrator at the June 15 call in which she said that "(Consumer Rule R-
22): N/A" really meant that the rule was applicable and that she "did not understand
procedure and protocols to mean general policies", I saw the urgent need to be able to
preserve records of the upcoming hearing and notified the case manager on June 17 that I
planned to hire a court reporter. I further notified the case manager that I planned to hire a
Mandarin/English interpreter for the hearing. (Ex. 35)

47. Although the Consumer Arbitration Rule R-27 does not provide for an opposing party to
object to any party's stenographer arrangements; does not establish the level of details he
ought to provide as part of the three-day notice; and does not speak on the matter of
whether a stenographer may be present for part or the entirety of the hearing, the
opposing counsel objected to my request for the stenographer. (Ex. 35) The opposing
counsel made no objection to my plan to bring an interpreter.

48. Although the Consumer Arbitration Rule does not permit an arbitrator any discretion on a
party's notice to bring stenographers and interpreters and does not even call for notice to
the arbitrator or opposing party of one party's plan to use interpretation, Barakat wrote to
parties on June 21 that my request to have a stenographer present must be subject to the

defendants' approval that very day and further that my request to have an interpreter present was conditional on answers from me as for which portions of the proceeding the interpreter may appear. (Ex. 36)

49. I immediately replied with the names and the availability of the interpreter and stenographer, (Ex. 36) but Barakat never gave her approval. Although the Consumer Arbitration Rules are clear that a party has the right to interpreters and stenographers, I was afraid that Barakat would bar them from joining the hearing the following day and eventually did not pay the deposit to book either.

June 22 Hearing

50. In my opening statement at the June 22 hearing, I gave citations of case law and points of authorities related to my claims. Barakat, however, cut me off and told me to save them for a written instrument that she would allow me to submit after the end of the session. At the end of the hearing, however, Barakat ordered me to file a memo about the case law by the end of business next day, which was less than 26 hours away. In the same breath, Barakat gave the opposing counsel 14 days to respond with their own memo of law.

51. The defendants presented the only fact witness they identified, Jose Pablo Lippi Ceciliano, and did not produce the two fact witnesses who handled my Skype account in 2019. Still, I was able to identify one, Leanard Andro Frondoso, as the employee of a Microsoft contractor, Concentrix, and Lippi, under my questioning, also identified Rion S. as a colleague whom Lippi personally knew and worked with in Microsoft's executive legal department. I asked Barakat to compel the defendants to produce these two fact witnesses for continued hearing. I was interested in testimonies of these two witnesses because they, unlike Lippi, had interacted with me before I threatened legal action against the defendants in late 2020 and were the individuals who repeatedly misled me about the reasons of my loss of access to Skype service before Lippi, under the threat of legal action, offered a seemingly more honest answer in October 2020. Barakat denied this request.

52. According to Lippi's testimony, he joined Microsoft 16 months prior to the hearing; he worked in executive legal department and took escalations from Microsoft's executive, legal, press departments; he was trained to use Microsoft's Passport and Back Office tools to identify locked accounts and to unlock them; that when a customer reached out, the first steps he took involved making sure the customer's account had not been compromised. Barakat disallowed my question to Lippi as to his education in IT and prior IT work experience.

53. According to Lippi's testimony, my Skype account was set up on December 11, 2018, and its IP was logged and associated with hundreds of malicious accounts, which is also why I was unable to use my Skype service in January 2019. In total, 259 Skype accounts were created on that IP, and 186 were blocked as a result of Microsoft's suspicion of inappropriate or malicious account activities. Barakat disallowed my questions to Lippi

as to 1) why my account was not blocked right away on December 11 when I made the payment but only later in January 2019 when I tried to use the service that I had paid for; 2) whether malicious activities took place with my account; 3) what evidence the defendants had of the other accounts' illegal activities.

54. According to Lippi's testimony, a Skype or Microsoft user who incorrectly entered password several times, or a user who created her account on an IP address associated with other suspicious accounts, may see her service discontinued. The user can then enter a phone number to revive her account. If she is unable to provide a phone number, she may have a verification code sent to her email address used to create the account. Lippi also testified that he did not know what would happen to mobile numbers collected during the verification process. Barakat disallowed my questions to Lippi as to 1) why the email verification option, as opposed to the cellphone verification option, was not readily available to the user, and 2) what a user's possession of a phone number had to do with whether or not she had used the Skype account maliciously.

55. The opposing counsel asked their witness about his interpretation and understanding of the Microsoft Service Agreement. According to Lippi's testimony, he interpreted the agreement to mean that even if Microsoft violated the terms, the agreement limited damages to "Free Account" users to just $10 and that paying for Skype service would not change the user's Skype account type into anything other than a "Free Account". I objected to the defendants' use of factual witness to offer legal interpretations of a document, but Barakat overruled my objection. Under my questioning, Lippi testified that the definition of "Free Account" was not given in the agreement and that the term is not encountered by a user during the process of signing up or paying for Skype service.

56. According to Lippi's testimony, the criteria under which the defendants terminated service for an account were also updated every month or every other month and that these updates were reflected in the "Reputation Scores" of each account or IP address.

57. Barakat disallowed my questions to Lippi as to 1) his knowledge of the defendants' efforts to comply with New York law on reporting hacked accounts; 2) whether he had reviewed any New York City-IP based accounts; 3) whether it was possible for a human agent to override the system based on her knowledge of the customer who was denied service by the "system tools"; 4) what the the function or role of customer service was; 5) whether he could find "suspicious activities" mentioned or defined in the service agreement; 6) whether in his training and work experience at Microsoft he was ever trained or instructed to use VPN for any reason or any occasion; 7) whether he was aware of any colleagues or other defendant employees who were instructed to use VPN for any occasion; 8) whether he ever connected to Microsoft services through a VPN and which

VPN service he used in connecting to his work; and even 9) his investigation into a similar incident relating to my Microsoft account (Complaint, ¶¶8-10) referenced in the witness's email to me on November 11, 2020. (Ex. 50)

58. Barakat did not ask parties whether they had further proofs to offer or witnesses to be heard, as she was required to do by Consumer Arbitration Rules R-40. When I pointed out that I would have more evidence to introduce, including public records that governmental agencies had not been able to provide in time, Barakat refused to consider my requests to delay the closing of hearing until I could obtain the relevant evidence.

Post-Hearing briefs

59. Barakat refused my request to have the same amount of time – or at least more than just one day - to prepare my post-hearing briefs as the defendants would in preparing theirs (14 days). Given the one-day deadline, I hastily put together on June 23 (Ex. 39) a list of case law and authorities regarding 1) how a court must treat pro se parties' filings; 2) New York General Business Law 349; 3) damages in Loss of Time and Inconvenience; 4) evidence regarding pattern of racketeering activities; 5) sanctions for a party's failure to produce documents and witnesses and to comply with production order; 6) contractual law. (Ex. 37)

60. I also submitted evidence pertaining to Federal Trade Commission's investigation into another business that defrauded consumers in a manner similar to the way the defendants blocked my access to services that I paid for. (Ex. 38, 40)

61. I also submitted evidence that established the identity of one of the fact witnesses, Leanard Andro Frondoso, whom the defendants refused to identify or produce at the hearing. (Ex. 41, 42)

Fourth objection to Barakat's qualification as arbitrator

62. On June 25, I submitted to the case manager a fourth objection to Barakat's qualification. (Ex. 43, 44) This time, the case manager replied that my objection would now be forwarded "[t]o the appropriate managerial personnel." (Ex. 45)

63. On July 2, the case manager shared with parties a letter from AAA on AAA stationary confirming the receipt of my June 25 objection. (Ex. 46) However, the case manager refused to answer why a similar letter was not issued for my second and third (June 16 and June 18) objections. (Ex. 47)

64. On July 9, the case manager shared with parties another letter from AAA on AAA stationary, stating simply that "After careful consideration of your respective contentions, the American Arbitration Association (AAA) has determined to reaffirm the appointment of Myrna A. Barakat as arbitrator in the above-referenced matter." (Ex. 48)

65. On July 13, Barakat issued a signed award for the proceeding, (Ex. 49) which, in three short pages, contained numerous factual errors contradicted by records, such as Barakat's assertion that "at the evidentiary hearing on June 22, 2021, HW asserted additional claims of RICO violations...These claims were not part of any of his prior demands", whereas my Demand and Amended Demand alleged a joint "enterprise," acts of wire fraud, a pattern and open-ended "continuity" of these acts and demanded treble damages and my final, June 4 list of claims specifically demanded "$55,010 in statutory and actual damages pursuant to New York General Business Law and federal antitrust and racketeering statutes"; Barakat's assertion that "HW claims that he was singled out", whereas I said no such thing and in fact alleged in my filed demands and at the hearing that the defendants' fraud scheme ensnared many other customers and requested evidence to be included for the arbitration, a request that Barakat denied at the hearing and ignored in post-hearing briefing (Barakat thoughtlessly contradicted by her own words on the same page that "HW claims that this incident was not an isolated event but...constituted "a clear pattern of criminal behavior"); and Barakat's assertion that the defendants' actions were "generally accepted business standards", whereas she had barred discovery of the defendants' general business policies and standards at the June 15 conference and in her second scheduling order and barred my questions to Lippi about his handling of similar incidents and customer inquiries.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on October 11, 2021 in New York, New York.